Case number 25-3023, United States of America v. Ezra Griffith, Appellant. Ms. Lovely for the Appellant, Mr. Goodand, the Appellee. Good morning, Your Honors. Erica Hashimoto, Director of Georgetown Law's Appellate Litigation Clinic. With the Court's permission, third-year law student Brittany Lovely will present her argument on Mr. Griffith's behalf. Glad to have you here. Thank you. Ms. Lovely? Good morning. May it please the Court. The second amendment issue we raised in our brief is currently pending before a different panel of this Court. If Your Honors don't have any questions on that, we will rest on our briefs on that issue. This case is here on Mr. Griffith's request for remand to consider two ineffective assistance of counsel claims. On direct appeal, the standard requires that we have shown a claim that is not conclusively foreclosed by this record. We have. Defense counsel was deficient in two respects. First, they failed to move to suppress a statement that was the product of Miranda custody. And second, they failed to meaningfully respond to the government's heavy reliance on flight as proof of guilt. In combination, these two errors put a closed case in a position of prejudice for the defense. In line with this Court's precedent, we request remand for factual development. On Miranda, the government collapses two distinct inquiries. A Terry stop may be lawful under the fourth amendment, but that does not resolve whether questioning during that stop was custodial under Miranda. Terry is taken from the officer's perspective and considers officer safety. It is an exception to the fourth amendment probable cause requirement, not the fifth amendment protections against self-incrimination. Miranda, in contrast, is taken from the perspective of the individual stopped and asks whether a reasonable person in Mr. Griffith's position would feel restrained to a degree akin to formal arrest. Well, I think we have some Supreme Court cases saying that the degree of restraint is the first requirement for Miranda custody. And the second is that there be the environment be inherently coercive akin to station house questioning. So and I guess we also have Burkham are saying normal Terry stops don't involve that kind of inherently coercive pressure. So I assume the first word out of your mouth is going to be handcuffs. But what creates that coercive environment in this case? Your Honor is correct. This handcuffs are a consideration, but this is a very fact intensive inquiry. And here we have Mr. Griffith handcuffed behind his back, pressed up against a pole, multiple officers surrounding him. And, you know, as you said, handcuffs, this is a hallmark of formal arrest. He was questioned in the middle of a frisk and no reasonable person in that situation would feel free to leave. But the request here is for factual development. Part of the deficiency is that counsel didn't develop the record on Miranda. There was no movement to suppress the statement. So there was no suppression hearing on Miranda. There are many facts to be developed at the district level to consider whether custody is a factor here. What kind of facts? So we have the video. Just concretely, do you have an idea of what kind of facts you think should be developed if we were to revamp? Yeah, the positioning of the officers is something that is not clear from the record. There were also other people on scene that we could hear from to speak to, you know, where the position, where the officers are, what was said after the questioning and before he was Mirandized or taken, you know, into custody officially. And so I think that there at the district level are a lot of things that could come out that would speak directly to custody. And your honors don't have to decide custody at this moment. We are just asking for factual development. OK, can you for this issue, can you can you address prejudice? So one difficulty on your side might be that it's true that the government emphasized this statement. I have no weapon statements in closing, but it's also not obvious that that is a very good point. I guess the Defense Council said in closing, that's a very natural thing to say if you're being patted down for weapons. So why why would that be so inherently incriminating that it would give rise to prejudice? So the errors in this case really shaped how the jury understood the evidence. As we saw, this wasn't a close case. And so the government's heavy reliance or this was a close case. And the jury deliberations really speak to that. They spent more time deliberating than they did hearing evidence. And so this statement, coupled with the government's heavy reliance on consciousness of guilt being the linchpin of their argument, tells us this was highly prejudicial to Mr. Griffith. It was this statement and flight that the government needed to bridge the gap in their evidence. And that is what was really prejudicial. In Muhammad, this court has found that the errors that shape the inferences drawn from evidence carry a heightened risk of affecting the verdict. And at this level, we're just asking for remand. It's a colorable claim at the very minimum that this could have affected Mr. Griffith and that there is a reasonable probability that at least one juror could have had reasonable doubt. There were fingerprints on, was it the magazine? The magazine had a very minuscule amount of collectible data, DNA, DNA data. More than the gun had, right? One of them was inconclusive and one of them was at least less inconclusive, right? Yes. Which was the more conclusive? The magazine. The magazine. Okay. The magazine was sticking out of the gun. And what are the statistical chances that the magazine was not his? It was one in 20 trillion times more likely that it was him and four unrelated individuals than not him and four unrelated individuals. It seems pretty prejudicial. But the government does not have any explanation of how or when the gun was handled. And the minuscule amount of DNA that was collected is a third less than is normally collected in cases like this. It would be one in 10 trillion instead of one in one trillion? I think that is a scientific question. I can't tell you about the odds of that. But I can tell you that because it was so much less, even the government's expert witness testified that they couldn't beyond a reasonable doubt say that it was Mr. Griffith's DNA. And the jury also heard testimony that there was other ways that DNA could have gotten there, right? He was in the park with friends all day. This could have been dropped by someone else. He could have shaken someone's hand. And the secondary transfer is an option here. So these are all things that the jury heard. But the failure of defense counsel to test the Miranda issue and the flight issue really prejudiced Mr. Griffith. There's a very small amount of that. Can I pick up on part of your answer? So do you have — what would the reasonable doubt look like? And to build on Judge Walker's questions, this gun is found next to where he ran in a place where no one would put it on purpose. It's just sort of sitting there next to the sidewalk. And it has his DNA on it. So — or at 99.999% chance it has his DNA on it. So someone would need to think both that, you know, he high-fived someone and then that person touched the magazine, and that for some reason that person put it in an exposed place next to the sidewalk. Is there a more reasonable way to explain what the reasonable doubt would look like in this case? There is. On the body-worn camera, you can see someone walking by. That is one explanation, like right where the gun was found. And that person was never talked to. That person may have come from the park. They had a gun. No one ever — Why would they place it on the ground and just keep walking away? The officers were coming. There's no — I mean, I can, you know, speculate. But there is no explanation as to how the gun got there. No one saw Mr. Griffith with a gun. No one saw him throw a gun. No one testified to him having a gun. So there is no other explanation that the government has offered. Well, there's no other explanation than what? You know, that — I mean, there is no conclusive explanation of how the gun got there. And the one possibility for it not being his gun is that it belonged with someone else who shook hands with him? Yeah, shook hands with him. He may have sneezed. Like, there are many ways that that small amount of DNA could have been transferred. I think defense counsel said that it was the size of maybe a grain of salt. So it's a very minuscule amount of DNA that could be collected. Like I said, one-third the amount that is normally collected in a situation like this. And I understand, like, you have — the facts are what the facts are, and I think you're doing a great job with the facts that you have. But was there any — anything in the record about a kind of, you know, the type of meeting before this incident that might have been like a handshaking event? Like a business meeting where they're like, you know, go to a conference table, shake hands, you know, negotiate the contract, take an Uber back or something? Like, the handshake theory seems like an odd theory. There were a lot of friends coming and going in the park, so I think, you know, you gap up your friends at the park as people do. So I think that, you know, there are many different ways, and I see my time has expired. So there are many different ways that this could have happened. I think that what we are raising here is that counsel should have tested the issue. We were talking a lot about what was on the record, and part of the deficiency is that counsel did not develop this record. I have just one more quick question.  I didn't — what was that? What is DAP up? It's like shake hands, basically.  Yeah. A cool way of shaking hands. Cooler than I am. Let me ask you, did you mention that he was the only one who ran of his group? Isn't that right? Yes. And when the officer said, what do you got, man, or something like that, and he answered, I don't have a weapon. I don't got no weapon or something. Is that right? Yes. And how long was the jury out again? A day. They heard evidence for less time than they deliberated. Okay. And the only three pieces of evidence were the flight, the small amount of DNA, and the statement. Well, and the furtive movements he made. It's not really clear what the officers meant by that. He was wearing a full body suit, a jumpsuit, and it's not clear from the record. We can't see those movements, so the testimony is not clear what the officers meant, and that is what the jury walked away with as well. All right. We'll give you a couple minutes in reply. Thank you so much. Mr. Goodhand. Good morning. Good morning, Your Honors. May it please the Court, David Goodhand for the United States. Remand for an evidentiary hearing in this case is unnecessary. The facts necessary for this Court to assess the merits of the proposed Fifth Amendment custody motion are already reflected in the copious body-worn camera footage and Officer Wood's detailed testimony about the stop. And in that respect, I take my cues from my opponent's brief. In their briefs, they never identified any facts that were missing relating to just the pure merits. Instead, the brief did focus on the question of why defense counsel did not make this motion. And I know here today there's been some vague suggestion that the positioning of the officers might be important. Number one, there were two body-worn camera videos introduced at the suppression hearing. I would suggest that covers the landscape on this. In addition, we have Officer Wood's detailed testimony about the suppression hearing and the trial. Now, I recognize when I say this that the general rule here in Rashad's world is remand. But this Court has said when the record clearly shows the claim is meritless or when no further factual development is needed, we may dispose of the claim without remanding. Now, turning to the merits. As we've argued in our brief, we believe the Fifth Amendment custody motion, with the facts that are in the record, is meritless. This is, and of course, you can't be in it. I'm sorry. If the standard is clearly meritless, this seems to tee up a question that we've twice avoided resolving and that there's a circuit split on, which is during what is otherwise a Terry stop if you slap handcuffs on someone. Is that Miranda custody? It's hard to get to clearly meritless, isn't it? Two points, Your Honor. First, I think the circuit split actually relates to the question of whether or not handcuffs can necessarily convert an otherwise lawful Terry stop into custody. So everybody agrees, I think, this Court, all the circuits, that we're talking about a mosaic analysis. That is, you look at the entire scheme of things and ask the question, as Hal said, the additional question is whether the relevant environment presents the same coercive pressure as the type of stationhouse questioning at issue in Miranda. And so my only point is, and Colter, I think, the Fifth Circuit case we rely on heavily in our brief, provides five useful factors to consider when you're assessing the coerciveness of the environment. And I would suggest that for those five, plainly tip in favor of no custody. Of course, we have the handcuffs. You know, that's, of course, the sort of elephant in the room, if you will. But simultaneous with the handcuffing here, we have, as the body-worn camera footage reveals, Officer Woods' declaration to the defendant, the suspect at that point, you know, the exact phrasing is, you're just being stopped. Relax. You're just being detained. I get why you're just being stopped is not so threatening. Isn't you're just being detained? It sounds a lot like you're being arrested, doesn't it? I don't think so. And, again, I think the tone is important here, number one. But, number two, I would put a lot of emphasis on just. To my mind, that phrasing and the conversational, cordial nature of the interaction between Officer Woods and the suspect is akin to sort of what Berkamer called a presumptive, it's presumptively temporary. A traffic stop, Berkamer said, passengers, drivers understand is presumptively temporary. That's why we're comfortable not having Miranda custody requirements in that context. Here, I would say the admonition of Officer Woods served the same purpose. You're just being detained. You're just being stopped. If we step back and ask, would a reasonable person in those circumstances understand that they were under restraint associated with formal arrest? I think the answer is no. And so, from the government's perspective, if you take the mosaic of factors, you know, the other, I've already touched upon the officer's statement regarding the individual's freedom to move. The location of the questioning is very important here. This was a public park within view of the defendant's friends who he had just left. That, of course, diminishes the possibility that an otherwise. I appreciate all these arguments. And just to back up the point of my initial question, I think as this reflects, this is very fact dependent. It's arguably a close question because it implicates this issue of the salience of the handcuffs. And if the standard is just, it has to be a colorable claim, what's the, it sounds like that makes it a colorable, debatable claim. It could be useful to have the district court resolve it in the first instance. I guess that's where I disagree. This is a pure issue of law. De novo review, it's a reasonable person standard. And so, it is perhaps a close question. But if this court is in just as good a position as the district court to assess the merits of that custody question, this court can do it. And then the district court is not saddled with a possible hearing about why defense counsel did or did not take the steps relating to the motion. I mean, I would think that if it is a close question, that helps you. Because it's not deficient performance for an attorney to, for whatever strategic reason, decline to make a motion that may well not succeed. As this court has said on many occasions, you're not deficient if you fail to file a meritless motion. But if you fail to file a motion that may or may not succeed, that presents a close question. And again, if this court disagrees with my core argument that the facts here as developed in the suppression hearing and at the trial and as reflected on the body-worn camera, don't answer the question of custody, then I think you should remand. Because then you will get into questions on the back half of Strickland, if you will, relating to, okay, what was the defense counsel thinking when he did that assessment? And I can imagine a scenario, frankly, at least one scenario, where the defendant says, I'm not afraid of that statement. In fact, maybe I think that statement could help me. I'm denying that I have a weapon. So let's not file a motion to suppress. So, but again, you know, and again, I full well understand Rashad is generally, you're remanded, if there are any doubts. Here, the only doubt is whether or not this amounted to custody. That's a pure question of law. It's de novo review. You all are as good a position as the district court to make that determination. The other reason to not remand would be if we don't think there's any prejudice. And the, you know, counsel today made an argument, a lot of arguments about trying to minimize the significance of the DNA evidence. You know, what's your best rehabilitation of that as a significant piece of it? Well, you know, again, as we've characterized in our brief, it's a pretty far-fetched suggestion of the secondary transfer. And to answer a question that came up during my opponent's argument, there was no testimony relating to handshaking, high-fiving, anything like that. That was supposition on the part of the defendant. Instead, what there was was this. that the officers did not stop. And so in closing argument, the defendant does what a defendant does, try to argue reasonable inferences based on that. That was a pretty attenuated chain, I would suggest, for secondary transfer. Coupled with this sort of, if I can, the far-fetchedness of this notion that somebody who had had high-fived the defendant, then decided to leave his firearm right next to the fence line, openly displayed. You know, on the prejudice, I do think that's an alternative ground here. My opponent said that really there were only three pieces of evidence here. One, the statement, two, the flight, and three, the DNA. That's, I would suggest, sort of a diminishment of the government's case. It is very important, I think, that the gun was found directly on the flight path of the suspect. The gun was clean and dry, as the photographs reveal and as the testimony demonstrated. The gun was fully exposed. Again, you can see this on the body-worn camera. And then we have the waistband adjustments, which cannot be underestimated to the extent that we had experienced officers who described what they saw as they approached the suspect in the pavilion. And there were three different occasions where they saw adjustments to the waistband. They have plenty of experience in firearms, and they said these suggested to them that he was armed. I just want to close with one thing. I see that I have five seconds left. It's important to understand why we have Terry stops. In this context, we want some ability of the officers to ask questions because that's the point of a Terry stop, to investigate. You can either dispel suspicion or confirm suspicion. At bottom, what I would suggest we have here is a non-coercive Terry stop that has not shifted into Miranda territory. If there are any other questions, I'd be happy to answer them. But otherwise, we would ask that you affirm the conviction below, number one, and number two, that you decline the request to remand. Thank you, Your Honor. Thank you. Ms. Lovely, why don't you take a couple minutes? I'd like to touch on two points, that Miranda focus and then focus on prejudice. First, the government asked this court to resolve a fact-bound custody question on a silent record. But even they acknowledge this uncertainty. This court has not resolved whether handcuffing during a Terry stop constitutes Miranda custody. They discussed Berkmer, and I will briefly say that this was anything but a routine stop. And even this court, under Jones, found in similar circumstances for a stop where, you know, one officer followed an individual into a stairwell, pulled them down by their waist, and asked the question prior to handcuffing, the exact same question. This found custody, but it fell under a very narrow exception to Miranda protections. So this makes the issue at the very minimum debatable. And under this court's precedent, debatable issues on a silent record are remanded, not resolved on direct appeal. Turning to prejudice, at this stage, the question is not whether prejudice is proven, but whether it is conclusively foreclosed. And it is not. This was a close case, and the government relied heavily on inferences of consciousness of guilt to prove their case. For these reasons, the court should remand for factual development. All right. Thank you. Ms. Lovely, you were appointed by the court to represent the defendant, and you've done an outstanding job. Thank you.
judges: Henderson; Walker; Garcia